OK, next and last case on the calendar is the United States versus six or six defense. I think starting with Alan, Sean Allen, Eric Dixon, Jeremiah Skidmore, Jason Potter, Ryan Clarity and Michael Fong. So there are one, two, three, six defendants. I don't know how many lawyers are here. Three, maybe more than four, five of these. So if you decide I can divide up your time. We have your right. Go ahead. Thank you, Your Honor. I'm Larry Jenner. I represent the defendant form. I'll be followed by Penny Strong, who represents defendant Potter and Wendy Holden, who represents defendants Dixon. And I'll concentrate my arguments on the jurisdictional issue. The defendants would like to reserve five minutes for rebuttal. Your Honor, the jurisdictional argument this case boils down to this. There is no economic nexus present to justify federal jurisdiction over the actions of these defendants at this place at this time. I believe when you've read the cases cited in the Supplemental Authority, and particularly this court's recent pronouncement in McCoy, that you will conclude that this is a purely private conspiracy, not affecting any activity, economic activity anywhere. It's a street crime that should have been prosecuted in state court. Your Honor, it's a crime that had it been committed on the street by Pioneer Park, there would have been absolutely no issue whether it's federal jurisdiction whatsoever. If it had been on the road, if it had been on the sidewalk, perhaps the federal government could make an argument. But since it's in Pioneer Park, that and that alone gives rise to the idea that Pioneer Park is a public accommodation of its statutes. Your Honor, I must confess, I didn't read the quite recent decision in McCoy completely, but I did kind of look at it. And that deals with, is that a pornography case? Yes, sir, it is. McCoy is a child pornography case arising out of it. And child pornography in our circuit and other circuits disagree, but that's a kiddie porn case under the federal statute. And what this circuit ruled was that the picture of the woman involved, Mrs. McCoy and her daughter, nude, which was discovered by an employee at the base of Photoshop at this Navy base, was a purely intrastate activity that had no effect on interstate commerce whatsoever. And therefore, there was no economic nexus. And the problem that the court wrestled with in McCoy is, first, they found the statute unconstitutional as applied to McCoy because there was no effect on commerce and because it was a non-economic activity. And they derived that reasoning from Morrison and Lopez, both decisions that the Chief Justice authored. And in Lopez, the Chief begins by discussing the three areas of commerce that can be regulated by the Congress. The first is the instrumentalities of Congress. People and things that flow in commerce. The second is the channels of commerce, the highways and byways of commerce. And the third, which is the only thing that logically concerns us here, is the things people do, the activities that somehow affect commerce. Now, the government's argument has been in their brief, well, the park itself has stuff that has traveled in the course of commerce and people who have traveled, but that's not the analysis. And the recent cases focus on, and this is a crucial issue in this case, Judge, what the defendants did. And in the record in this case, it is admitted that what these defendants did in essentially getting drunk at a neo-Nazi party, going to the park, running through that with sticks and chains and whatnot, and running three members of minority group out of the park. Not just what they did. It's what you said earlier that it's whether they did it in a place of public accommodation. And that's, Judge, that's a jurisdictional element of the first count of Section 241. And it's a requirement under the Commerce Clause, because all of the civil rights statutes are based on the effect on commerce and the Section 5 of the 14th Amendment. The government has to prove that. Without that, there's no case. This court in Papadopoulos, the case, a case that involved the arson statute, invalidated a conviction of burning a private home by a private person when the jurisdictional link to prove that element was only the interstate transport of natural gas to heat the house. The teaching point from Papadopoulos, though, is whether it's in validating a statute or upholding a statute or looking at a jurisdictional element of the crime, the courts use the same analysis and same analysis of what commerce is. In this case, the jurisdictional element on Section 241 is provided by 42 U.S.C. Section 2000A, and that's the public accommodation, the definition of public accommodation in the park. We've raised, first, a factual issue that Ms. Strong will address concerning the fact that the park was closed and that there wasn't any public accommodation at the time. We've also raised the issue that, in this case, there is only non-economic activity that's going on at the time. And under the courts holding in Lopez and Morrison, the regulation under that third prong, the prong of the Commerce Clause when the Congress addresses what people do to other people, the Congress has the weakest power, and the courts maintain the strongest scrutiny over those acts when they regulate non-economic history. And the trend in this court, in McCoy, the Supreme Court in Morrison and Lopez, and other courts throughout the nation has been, when regulating non-economic intrastate activity, the federal government has no place. Is there any difference here that the activity, the alleged conduct, wrongful conduct, is also protected by federal and state discriminatory tools? Yes, there is. And that discussion brings us directly to Morrison. Because there is a legislative finding in Morrison that racial discrimination, in fact, affects commerce in many ways. And that finding in the statute, in that statutory pronouncement, is directed toward economic activity. In the history of the statute before the Senate, there was extensive testimony. Now, what Justice Rehnquist says in his opinion in Morrison is that he develops this four-part test in Morrison. And he says that's one of the things that courts should, in fact, consider. Is there legislative history and or is there an express jurisdictional element finding that a certain type of activity, i.e. racial discrimination, affects commerce? But those are the two least important elements the court should look at. This circuit in discussing, in the same discussion in McCoy, specifically points out that of the four-part test in Morrison, the two elements that the court should address first are the regulation of commerce or economic activity and the attenuated effect on commerce that the activity of the defendant focuses on. And first, if there's no regulation of commerce or economic activity by this prosecution, that's the first thing to look at. The second thing, if there is, is there an attenuated effect on commerce? The Wickard versus Colburn effect. That is, well, I'm not going to sell my wheat here, but it has the ripple effect, the inference upon inference. And here, if you look at the facts judge in this case and what Pioneer Park does, there is an admission in the testimony of the people who run it that the acts of these defendants had no effect on the operation of Pioneer Park whatsoever. What about the government's alternative argument, I'll call it, that the 245 can be appelled as an enforcement of the 13th Amendment? Your Honor, the 13th Amendment argument, I think the answer to that is best addressed in Miss Fulton's reply brief. And that is, the Chief Justice mentioned specifically in Morrison that the civil rights cases are still good law. And therefore, the only way in which a penal federal civil rights legislation can reach purely private action is through the Commerce Clause. And so I would ask the Court to reject the 13th Amendment analysis as inconsistent with the Chief Justice's opinion in Morrison and his affirmation of the continued vitality of the civil rights cases. The Second Circuit has addressed this, I don't know if it's the exact statute that we have here, but it's similar in the United States v. Nelson in a very lengthy opinion by Judge Calabresi. Is it suggestive that this is okay? The Second Circuit and the Eighth Circuit have indeed upheld Section 245 using 13th Amendment analysis. And my suggestion to this Court is, first, Nelson is 277 F. 3rd 190. I believe that that case predates Morrison and it definitely predates the Circuit's analysis in McCoy. Bledsoe definitely predates the analysis in Morrison. And so after the pronouncement by the Chief Justice in Morrison in 2001, the question is still presented that if the civil rights cases are still good law, can such an analysis, if you consider the precise facts, and the precise facts in this case are a penal federal civil rights legislation reaching purely private action. And I don't believe that those cases are precisely on point in that particular analytical framework. I would just note that, just according to my records, Nelson was argued on May 3, 2000. Supplementally, on May 9, 2001, it was decided on January 7, 2002. If it was decided January 7, 2002, then it is in fact. Morrison was decided in 2000. It was decided. It is a post-Morrison case. And my time that I have reserved for the first argument is now up. So I would like to yield to Mr. Arlen if I may. Fine. Good morning. My name is Penelope Strong. I'm here to argue on behalf of Jason Guy Potter and his defendants. We have argued that as Pioneer Park was closed and all of the criminal activities took place after the magic hour of 10 p.m., there simply is no clearly established constitutional right. A timely Rule 29 motion was made with regard to this issue and denied by the court. Your Honors, there simply was no specific right of accommodation under the facts of this case. Well, it's not a public park. It's 10 o'clock at night. That's true, but it was charged as a right of accommodation. Does it change in any way? Yes, it does. Because cities, municipalities, and other governmental entities have the right and the power to regulate our constitutional rights. I cited to a- Well, let me ask you, they put up a fence around the park? Not exactly. They don't. You can still go into the park. Theoretically, you can. Yeah, you can go in there and have a little romantic, you know, whatever. You could. You could. But one of the defendants received a citation for being in the park after hours. So the power of that ordinance still is a feature. Well, the definitional statutes don't contain a temporal element, right? Do you agree with that? I agree with that. However, I cited to the U.S. v. Lanier case, and this ties into an important precept of constitutionality that I think this Court has to take a careful look at. Although we didn't make a full pretrial motion on void for vagueness with regard to this specific charge, it is our contention that this charge is void for vagueness because there is no clearly established right of accommodation accruing to the victims after 10 p.m. In U.S. v. Lanier- You say you do make the void for vagueness argument? Yes. The U.S. Supreme Court said you judge- No, no. You make it somewhere in your brief? Yes. Where? I believe I made it in the section on the closing of the park. And it was also made, I believe, Your Honor, in the context of the Rule 29 motion as well. Lanier is very important. It says when you judge the contours of whether a right is established or not for a criminal prosecution under 18 U.S.C. 241 and 245 or 2, you must look at the same standard that you do for Bivens actions and 1983 actions. Has that right been clearly established? There was no right to be in the park, either for the defendants or for the victims, because the park was closed by city ordinance. I know that seems nonsensical, and you may say in the broader sense, doesn't that lead to a perverse result in terms of the heightened interest in the Federal law regarding anti-discrimination laws, but there are other remedies. This case could have been charged under the Montana Hate Crime Statute, which was enacted in 1989. And quite simply put, this is a serious criminal prosecution. Our clients are all serving extremely long sentences. They were entitled to specific notice. The government did not charge the right to be free from racially motivated violence. In U.S. v. Lanier, the state court judge there, the exact issue was, is there a right to be free from sexual assault for the women that he assaulted? So in sum, that is our argument. It relates to not only the Rule 29 issue fairly clearly. Theoretically, we need the standard viewed in the light most favorable to the government. They failed in terms of their proof on that issue, and we believe that the conviction should be reversed. Thank you. MS. HOLTON. May it please the Court, my name is Wendy Holton, and I'm going to just briefly address the Thirteenth Amendment issue in this case. Your Honors, after United States v. Morrison, there is, Justice Rehnquist left no question about the continuing viability of the civil rights cases. And regarding the Thirteenth Amendment issue, as it was discussed in the civil rights cases, it concerned whether a private action in closing and in a public conveyance or place of public amusement by an individual person constituted a badge of slavery. And the Court held that it did not, and that it would be, in fact, running the slavery argument into the ground to make it apply to every act of discrimination. In other words, no mere personal assault or trespass operates to reduce a person to a condition of slavery. Or stated another way, the Thirteenth Amendment doesn't apply to individual acts of thuggery. The civil rights cases do talk about what they're talking about by badges of slavery. They give some specific examples, and they say those fundamental rights, which are the essence of civil freedom, namely the right to make and enforce contracts, to sue, be partied, give evidence, and to inherit, purchase, lease, sell, and convey property as is enjoyed by white citizens. They tell us what constitutes badges of slavery. And, in fact, the United States Supreme Court cases upholding particular laws and convictions under the Thirteenth Amendment doesn't go astray from those things that are listed there. The one case where it might be asserted that it did is in Griffith. But in Griffith, we're clearly dealing with travel on an interstate highway, which could then come under the realm of the Commerce Clause. So where did Judge Heller really go wrong in Nelson? In Nelson? In Nelson, he didn't look at the impact of Morrison, and then didn't go back to those specific things that are considered badges of slavery or were delineated in the civil rights cases. And he didn't also look at each case where a conviction had been upheld under the Thirteenth Amendment by the United States Supreme Court. Your Honors, the Thirteenth Amendment doesn't apply to individual acts of prejudice. Those must be reached, if they can be, under the Commerce Clause. If they cannot be reached under the Commerce Clause, they are subject to State rather than Federal jurisdiction. And here, there's no indication at all that the State of Montana was either unwilling or unable to address the issues raised by this case. And I'll leave for a minute and a half for rebuttal. All right. Thank you. Good morning, and may it please the Court. My name is Tova Calderon, and I represent the United States in this appeal. Your Honors, I'd like to first clarify this issue of interstate commerce and emphasize that, in this case, it pertains only to the defendant's convictions under Section 241 for conspiracy against rights. With respect to the 245b2b convictions, we rely primarily on our Thirteenth Amendment argument to defend the constitutionality of that statute. Moreover, that statute does not have an express jurisdictional element. It protects against forcible or violent interference with the right to use a public facility, not a public accommodation. The purpose of the interstate commerce evidence in this case served only one purpose, and that was to establish the existence of a Federal right to support the charge of conspiracy against rights. Thus, in order to avoid the constitutional problem in this case, I would urge this Court, as it did in Lamont in considering a challenge to the Federal arson statute, to approach the issue in this case as one of statutory interpretation. Count 1 of the indictment charged the defendants with conspiracy to violate the right created by Title II, as you know, the right to full and equal enjoyment at any place of public accommodation without discrimination on the ground of race. And Title II defines public accommodation as any place of exhibition or entertainment, so long as its operations affect commerce. It explains that the operations of such a place affect commerce if it contains sources of entertainment which move in commerce. And the statute further defines commerce as travel, trade, traffic, commerce, transportation, or communication among the several States. The question, therefore, is not, as the defendants have stated, whether the park patrol itself had a substantial effect on commerce, but rather whether the operations of Pioneer Park affect commerce within the meaning of Title II. In other words, whether Pioneer Park provides sources of entertainment which move in commerce. As we explained in our brief, the evidence in this case was sufficient to prove that it did. The Supreme Court held in Daniel v. Paul that a recreational facility, that is, a park that had a vote for swimming and boating, was a covered public or, I'm sorry, public place of entertainment under the statute because it contained paddle boats and a jukebox that had been purchased from out-of-State vendors. The Court held that such equipment constituted sources of entertainment which move in commerce. Similarly, in this case, our witness, Eugene Blackwell, testified that the playground equipment, picnic tables, barbecue grills, and other materials used in Pioneer Park were purchased from out-of-State vendors. Under Daniel v. Paul, we submit that these facts are sufficient to prove that, to establish that Pioneer Park was a covered public accommodation because it affected commerce within the meaning of Title II. There was additional proof of the park's nexus to interstate commerce. The park, on occasion, was used for commercial purposes, although it was a public park and free for the public. It was used for fundraising functions for national organizations such as the March of Dimes. It was also used for fundraising functions for local organizations but with national corporate sponsorship from state companies such as Exxon Oil, Pepsi, Marriott. Blackwell testified that these events frequently attracted out-of-State visitors and participants. Another one of our witnesses testified that every year the park is used to host the annual Symphony in the Park program. Again, although this was a free concert, the purpose of the event was to promote season ticket sales and generate revenue for the billing symphony. This event also attracted out-of-State visitors and participants such as musicians from other states that came to perform. The sound system for the concert was also provided by a production company from Colorado. The participation of these out-of-State individuals satisfies Title II since commerce is defined as travel, transportation, etc. Again, I'd like to emphasize that the government did not have to show that the park patrol itself affected commerce. Only that the operations of Pioneer Park affected commerce within the meaning of Title II. And again, this evidence was only necessary in order to establish the existence of the underlying federal right in support of the conspiracy charge as it was charged in 241. With respect to the Supreme Court's recent Commerce Clause cases and indeed this Court's recent Commerce Clause cases in Lamont and McCoy, the guiding principle which this Court has stated is a concern for, or rather a sensitivity to the balance between State and federal authority. The theme throughout all the Commerce Clause cases from the beginning, I think, has been this issue of federalism. And indeed, the Supreme Court has limited Congress's authority under the Commerce Clause to regulate non-economic violent criminal conduct, but it did not forbid it from doing so altogether. Rather, the Court and this Court have emphasized that the Constitution requires a distinction between what is truly national and what is truly local. Violent interference with a person's federally protected rights on account of that person's race is not a matter restricted to local concern. To the contrary, this country endured a bloody civil war and adopted three constitutional amendments to address the issue of racial hatred and oppression. More importantly, both statutes that issued in this case, Title II and Section 245, are part of a comprehensive body of federal civil rights legislation enacted in response to a national civil rights movement with the intent to eradicate racial discrimination throughout the country. In other words, this case is unlike cases challenging statutes that prohibit possession of child pornography, possession of guns in school zones, domestic violence, arson, et cetera. The enforcement of federal civil rights is just simply not an area that's expressly reserved to the States. Viewed in this context, therefore, the federal government does not intrude upon an area of purely local concern nor does it encroach upon State police powers when it prosecutes criminals such as the defendants, in this case, who are white supremacists and who conspire to intimidate and threaten to injure others for using a public park merely because of the color of their skin. The statutes are limited in that they only are directed towards violent conduct that interfere with federal rights. I'd like to read briefly from the Senate report for Section 245 because I think it explains it best and I don't think I exerted this in our brief. The Senate report explains that federal legislation against racial violence is not required solely because of the sometimes inadequate workings of State or local criminal processes. Too often, in recent years, racial violence has been used to deny affirmative federal rights. This action reflects a purpose to flout the clearly expressed will of the Congress. Thus, when a Negro, excuse me, I'm reading from the Senate report, is assaulted for attending a desegregated school or casting a ballot, it is not only the individual Negro and the peace and dignity of the State that is injured. Such lawless acts are distinctly federal crimes and it is, therefore, appropriate that responsibility for the vindication of the rights infringed upon should be committed to the federal courts. It's for these same reasons that we argue that Section 245b2b is constitutional under the 13th Amendment. 245 is limited, does not create a general federal assault law, which would perhaps encroach upon local police powers. Instead, it's limited in scope, as I already explained, as well as the application of 241 in this case, because they're aimed at conduct that is both racially motivated and intended to interfere with the exercise of federally protected rights. To respond to opposing counsel, and just to clarify, Morrison was not a 13th Amendment case. It was a Commerce Clause case, and there was a 14th Amendment issue in that case related to whether or not State action is necessary to sustain legislation under Congress's enabling powers, Section 5 powers. There was no 13th Amendment argument in that case or issue in that case. The controlling authority is the Supreme Court's decision in 1968 in Jones v. Mayer, which, to the extent that the civil rights cases that held that Congress had narrow authority to prohibit badges or to abolish badges and incidences of slavery under the 13th Amendment, to the extent that the civil rights cases held that, Jones v. Mayer in 1968 overruled that holding of the civil rights cases. In fact, Jones held that Congress has broad authority not only to abolish badges and incidences of slavery, but to determine what those are. And in that case, the Court held that nonviolent discrimination was a – that Congress had a rational basis for concluding that nonviolent racial discrimination constituted a badge of slavery. Indeed, I think if Congress could conclude that nonviolent discrimination constituted a badge of slavery, then certainly violent interference with Federal rights constitutes a badge of slavery. Indeed, a few years later in Griffin v. Breckinridge, the Court held that Congress could, pursuant to its Section 2 powers, provide a Federal cause of action for the violent assault of black men on a public highway. The Court concluded that it was rational for Congress to determine that such private racially motivated violence constitutes a badge of slavery. Both the Second and Eighth Circuits have held Section 245b-2b under the Supreme Court cases in Jones and Griffin. Indeed, in facts very similar to the facts in this case, the Eighth Circuit in the United States, be bled so, concluded that interfering with a person's use of a public park because he is black is a badge of slavery. And the Court actually cited to Justice Douglas' off-cited concurrence in Jones v. Mayer in which he described the exclusion of blacks from public places such as public parks as depicting a spectacle of a slavery unwilling to die. In the United States v. Nelson, the Second Circuit similarly upheld 245b-2b under the Thirteenth Amendment. And again, this case was decided two years after Morrison, by the way. The Second Circuit explained that acts of violence or force committed against members of a hated class of people with intent to exact retribution or create dissuasion against their use of a public facility have a long and intimate historical association with slavery and its cognate institutions. Indeed, slavery itself has been defined as preeminently a relationship of power and dominion originating in and sustained by violence. This practice of race-based private violence both continued beyond emancipation and was closely connected to the prevention of former slaves' exercise of their newly obtained civil rights. As we argued in our brief, we don't think that the time of the offense is at all relevant to the Court's analysis here. Section 245b-2b protects persons from being forcibly excluded from a public facility because of race. This right to equal use and enjoyment is not contingent upon hours of operation. To the contrary, Pioneer Park is a public facility at all times of the day. And in order to violate the victim's right in this case, the defendants also had to enter and enjoy use of Pioneer Park. Even if it was closed, they were violating the victim's rights to equal use and enjoyment. Cases such as the United States v. Lanier and other cases dealing with deprivation of federal rights by a state official are distinguishable because those cases do not define the federal right at issue. It is true that when you, for example, sue a state official under Section 1983 or prosecute a state official under 242, there has to be some sort of clearly defined right. 245 was actually enacted in response to a problem dealing to the problems of prosecuting state officials or others under 241 and 242. And, in fact, that's why 245 specifically enumerates the rights that are protected. I don't think it's vague. It's actually clearly defined in the statute. And it's not contingent upon what time of day the public facility is open or closed. What's your response to this McCoy case? McCoy, I think, actually is an example of why this case is different from the recent Commerce Clause cases decided by the Supreme Court in this case. In McCoy, the Court held that sort of homegrown, funny term, homegrown possession of child pornography does not impact interstate commerce. Sorry, I'm trying to find my notes. The case is distinguishable on several different grounds. I think, first, because in that case and also these cases challenging the federal arson statute, the question is whether or not the offenses impact interstate commerce. And the reason is because when Congress exercises its commerce power to regulate criminal activity, an area that's traditionally reserved to the states, there has to be a strong commercial nexus because Congress's powers are limited. However, in a civil rights case, it's different. The subject matter, first of all, has already been upheld by the Supreme Court as an area which substantially affects interstate commerce, racial discrimination. It has a substantial burden on interstate commerce, and that was first upheld by the Supreme Court after the Civil Rights Act was first enacted in 1964 in Heart of Atlanta and in Katzenbach v. McClung. Those cases were cited favorably by even the Morrison Court because racial discrimination falls within a class of activities that substantially affects commerce. It's not important to prove beyond a reasonable doubt that each individual act within that class of activities has an effect on commerce, such as the park patrol or the offense in this case. Whereas in McCoy, the simple homegrown possession of child pornography was not only interstate, but it was not even part of a class of activities which Congress found to have substantial effect on commerce. To the contrary, this Court held that it was the trafficking of child pornography that Congress intended to regulate and not the homegrown possession of child pornography, and that in order to conclude that such possession would have an impact on interstate commerce, the Court would have to pile inference upon inference. That's not necessary here because we have the evidence that was before Congress in 1964. Excuse me. Did that answer your question? So again, the theme in that case, I'm not going to get it back. I think the theme in that case, I think, was this, or the guiding principle, which this Court said was the sensitivity to the balance between State and national authority in the area of regulating criminal activity. Since I see that my yellow light is on, I guess, and I'm losing my voice, if there are no further questions, the United States respectfully asks this Court to affirm the judgment of the district court. Okay. Thank you. I'm going to take my last minute and 20 seconds to attempt to answer some of the Court's questions. First, the Jones case that's submissioned by counsel involved a civil action under section 42 U.S.C. section 1982, a civil case against defendants who wouldn't sell Mr. Jones a house, an activity clearly not only related to commerce, but also a civil action. A different topic is before the Court today in how we govern ourselves as to what the role of the State should be, what the role should the federal government be, and what has always been regarded since the time of the framers as a purely State function, the enforcement of federal criminal laws against violent acts of people against other people. On the argument of the park being closed, my client was the one that got the ticket for being in the park after hours. The crucial element here is that in every civil rights context, and the Clark case is a good example, that's the homeless people on the mall case where the homeless people were on them, there's going to be a protest there. And they said, well, we have a First Amendment right to protest in the park after hours. And the Supreme Court says, no, you don't, because even the First Amendment is a right on which contours can be placed as to time and to place. Contours, if they can be placed on the First Amendment right, certainly can be placed on a right to use the public park. Thank you, Your Honor. My time has expired.  Thank you. We thank all counsel. This case is now submitted for decision in the last case on today's calendar. We stand in adjournment for the day.
judges: Reavley , Tashima, Paez